**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI WESTERN DIVISION**

| | | |
|---|---|---|
| PEDRO JAVIER SANCHEZ PEREZ,<br><br>Petitioner,<br><br>v.<br><br>MARKWAYNE MULLIN, SECRETARY OF HOMELAND SECURITY; et al.,<br><br>Respondents. | ) ) ) ) ) ) ) ) ) ) | Case No. 4:26-cv-00515-RK |

**ORDER**

Petitioner Pedro Javier Sanchez Perez is currently being held in custody of the U.S. Department of Homeland Security, Immigration and Customs Enforcement at the Greene County Justice Center in Springfield, Missouri. Petitioner seeks a writ of habeas corpus under 28 U.S.C. § 2241—primarily, release from custody—challenging the lawfulness of his detention after having previously been granted humanitarian parole pursuant to 8 U.S.C. § 1182(d)(5)(A). After careful consideration and review, and for the reasons explained below, the Court **ORDERS** that the petition for habeas corpus is **DENIED**.

**Background**

Petitioner is a native and citizen of Cuba. In January 2024, Petitioner registered for an appointment with U.S. Customs and Border Protection ("CBP") through the agency's "CBP One" phone application.[1] On January 17, 2024, Petitioner presented at the El Paso Port of Entry and was granted humanitarian parole through January 17, 2026. Petitioner was also issued a Notice to Appear, charging him with being inadmissible under 8 U.S.C. § 1182(a)(7)(A)(i)(I), that is

> as an immigrant who, at the time of application for admission, is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the [Immigration and Nationality] Act, and a valid unexpired passport, or other suitable travel document, or document of identity and

[1] "CBP One" was an official mobile phone application through which certain CBP agency functions—such as making an appointment to appear for inspection at a point of entry—were available prior to arrival in the United States. *See Coalition for Humane Immigrant Rights v. Noem*, 805 F. Supp. 3d 48, 57 n.2 (D.D.C. 2025); *CBP One: An Overview*, American Immigration Council (Mar. 24, 2025), https://www.americanimmigrationcouncil.org/fact-sheet/cbp-one-overview/. The current administration ended support for CBP One by executive order dated January 20, 2025. *See Las Americas Immigrant Advocacy Ctr. v. U.S. Dep't of Homeland Sec'y*, 783 F. Supp. 3d 200, 210 (D.D.C. 2025).

> nationality as required under the regulations issued by the Attorney General under section 211(a) of the [Immigration and Nationality] Act.

(Doc. 1-1 at 4.) The Notice to Appear set a hearing for September 28, 2028. (*Id.* at 2.) Petitioner states that this Notice to Appear "was never filed with an immigration court." (Doc. 1 at ¶ 2.)

After being present in the United States for one year on humanitarian parole, during which time he possessed work authorization, Petitioner filed a Form I-485 Application to Register Permanent Residence or Adjust Status, seeking adjustment of status pursuant to The Cuban Refugee Adjustment Act of 1966, Pub. L. 89-732, 80 Stat. 1161.[2] Petitioner asserts that he is prima facie eligible for adjustment of status under The Cuban Refugee Adjustment Act. His application to adjust status remains pending.[3] Under the terms as issued, Petitioner's humanitarian parole (and also his work authorization) expired on January 17, 2026.

---

[2] The Cuban Refugee Adjustment Act of 1966 "is a note to [8 U.S.C.] § 1255, and provides that:

> the status of any alien who is a native or citizen of Cuba and who has been inspected and admitted or paroled into the United States subsequent to January 1, 1959, and has been physically present in the United States for at least one year, may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence . . . .

*Valdivia v. U.S. Atty. Gen.*, 380 F. App'x 793, 794 (11th Cir. 2010); *see Perez Velazco v. Mullin*, No. 26-cv-22026-BLOOM/Elfenbein, 2026 WL 1758217, at *1 (S.D. Fla. June 18, 2026) (noting that The Cuban Refugee Adjustment Act of 1966 "allows Cuban natives or citizens living in the United States who meet certain eligibility requirements to apply to become lawful permanent residents"); *Avila-Sanabria v. Lapin*, 243 F.3d 1272, 2000 WL 1507472, at *2 (7th Cir. Oct. 5, 2000) (unpublished) (noting that the Cuban Refugee Adjustment Act of 1966 "granted Cuban refugees additional rights" but "does not extend so far as to automatically adjust the status of all Cubans in the United States," and instead "provides a discretionary tool for the Attorney General to adjust the status of Cubans who had been paroled into the United States to that of lawful permanent residents").

[3] On December 2, 2025, after Petitioner's application to adjust status had been pending for almost a year, USCIS issued a Policy Memorandum (PM-602-0192) pausing USCIS adjudication of, *inter alia*, applications to adjust status filed by aliens from Cuba, among other countries identified in the June 4, 2025 Presidential Proclamation 10949, "Restricting the Entry of Foreign Nationals to Protect the United States from Foreign Terrorists and Other National Security and Public Safety Threats." *See* USCIS Policy Memorandum PM-602-0192 (Dec. 2, 2025), https://www.uscis.gov/sites/default/files/document/policy-alerts-PM-602-0192-PendingApplicationsHighRiskCountries-20251202.pdf [perma.cc/9566-45M4]. The policy was vacated by the district court for the District of Rhode Island on June 5, 2026, which found that the policy was unlawful under the Administrative Procedures Act. *Dorcas Int'l Inst. of Rhode Island v. USCIS*, __ F. Supp. 3d __, 2026 WL 1622708 (D.R.I. June 5, 2026), *stay denied (in relevant part) pending appeal*, 2026 WL 2042424 (D.R.I. July 15, 2026) & __ F.4th __, 2026 WL 2364384 (1st Cir. Aug. 14, 2026).

Approximately three months later, on April 1, 2026, Petitioner was arrested by the Missouri State Highway Patrol after a report had been made accusing Petitioner of theft.[4] The state law enforcement agency contacted the Department of Homeland Security, Immigration and Customs Enforcement, which issued a detainer. Petitioner was released from Camden County Jail and transferred to federal immigration custody the next day. No criminal charges were filed in relation to the reported theft. On April 3, 2026, after having been transferred to federal immigration custody one day prior, Petitioner was issued a Termination of Parole letter, (*see* Doc. 5-1), followed on April 6, 2026, with a Notice to Appear (as amended or corrected on April 14, 2026[5]), (*see* Doc. 1-3 at 1-4, 9-10). Petitioner remains in custody of federal immigration authorities.

**Discussion**

Title 28 U.S.C. § 2241 authorizes federal courts to grant a writ of habeas corpus on application of a person (including an alien unlawfully in the United States) held "in custody in violation of the Constitution or laws or treaties of the United States." *See Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004). Petitioner challenges the legality and constitutionality of the revocation of his humanitarian parole and his subsequent detention. Petitioner seeks release from custody (or alternatively a bond hearing) and declaratory relief regarding the potential for any future re-detention if released. Petitioner bears the burden of providing that he is entitled to habeas relief.

---

[4] Petitioner submits that he had responded to a request on Facebook to pick up an order of tires from a store in Camdenton, Missouri, but that when he arrived, the store told him that the order was fraudulent. (Doc. 1 at ¶ 19.) Petitioner was questioned by responding law enforcement and arrested. (*Id.*)

[5] The April 6, 2026 Notice to Appear charged Petitioner as being inadmissible pursuant to 8 U.S.C. § 1182(a)(6)—in addition to subsection (a)(7)—as being "an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General"; the notice similarly checked the box for "You are an alien present in the United States who has not been admitted or paroled." (Doc. 1-3 at 1, 4; *see id.* at 1 (alleging that Petitioner "entered the United States at or near unknown place, on or about unknown date" and that he was "not then admitted or paroled after inspection by an Immigration Officer").) The amended Notice to Appear removed the reference (and accompanying factual allegations) related to a charge of inadmissibility under § 1182(a)(6) and otherwise mirrored the original Notice to Appear, charging Petitioner as being inadmissible under § 1182(a)(7) and checking the box for Petitioner being "an arriving alien." (*Id.* at 9.)

The Court notes that inadmissibility under § 1182(a)(7) does not appear to preclude any adjustment of status under The Cuban Refugee Adjustment Act. *See Green Card for a Cuban Native or Citizen*, U.S. Citizenship and Immigration Services, https://www.uscis.gov/green-card/green-card-eligibility/green-card-for-a-cuban-native-or-citizen [https://perma.cc/4DWV-DR3L] (noting that "[t]o qualify for a Green Card, you must be admissible to the United States" and that "[d]ocumentation requirements" under § 1182(a)(7)(A), as a "ground of inadmissibility" does not apply for adjustment of status under The Cuban Refugee Adjustment Act).

*See Maye v. Pescor*, 162 F.2d 641, 643 (8th Cir. 1947). The Court addresses Petitioner's statutory and constitutional procedural due process claims, in turn, below.

## I. Whether the Expiration/Termination of Humanitarian Parole (resulting in Petitioner's Detention) is Lawful under Federal Immigration Law

Petitioner first argues that the revocation of humanitarian parole as had been granted when he appeared for inspection at the border in January 2024 was unlawful as a matter of federal immigration law.

Title 8 U.S.C. § 1182(d)(5)(A), allows the Secretary of the Department of Homeland Security, "in his discretion [to] parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States . . . ." Section 1182(d)(5)(A) specifies that humanitarian parole "shall not be regarded as an admission of the alien" and that when the Secretary determines that "the purposes of such parole . . . have been served the alien shall forthwith return or be returned to the custody from which he was paroled." The statute provides that the alien "shall [then] continue to be dealt with in the same manner as that of any other applicant for admission to the United States." Under this statutory scheme, then, "[p]arole allows an alien to physically enter the United States without being admitted" and "allows the Government to pause the inspection at the border and defer it to a later time without having to detain the alien pending a final admissibility decision, as would otherwise be required." *Blanche v. Lau*, 609 U.S. __, 146 S. Ct. 1981, 1987 (2026). In short, § 1182(d)(5)(A) "allows the Government to parole certain aliens seeking admission instead of formally admitting them, detaining them, or removing them." *Id.*

Title 8 C.F.R. § 212.5(e) addresses termination of a term of humanitarian parole which is granted under 8 U.S.C. § 1182(d)(5)(A), either automatically or upon written notice:

> (1) Automatic. Parole shall be automatically terminated without written notice (i) upon the departure from the United States of the alien, or, (ii) if not departed at the expiration of the time for which parole was authorized, and in the latter case the alien shall be processed in accordance with paragraph (e)(2) of this section except that no written notice shall be required.
>
> (2)(i) On notice. In cases not covered by paragraph (e)(1) of this section, upon accomplishment of the purpose for which parole was authorized or when in the opinion of one of the officials listed in paragraph (a) of this section [i.e., generally, "[t]he Secretary or his designees," including deputy field office directors], neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States, parole shall be terminated upon written notice to the alien

> and he or she shall be restored to the status that he or she had at the time of parole. . . . Any further inspection or hearing shall be conducted under section 235 or 240 of the [INA] and this chapter, or any order of exclusion, deportation, or removal previously entered shall be executed. If the exclusion, deportation, or removal order cannot be executed within a reasonable time, the alien shall again be released on parole unless in the opinion of [a designated official] the public interest requires that the alien be continued in custody.

Petitioner's argument that the termination of his humanitarian parole is unlawful under federal immigration law is simply not supported by the record and the admitted facts. Petitioner acknowledges that he was expressly granted humanitarian parole for a two-year period from January 17, 2024, through January 17, 2026. (Doc. 1 at ¶ 2; *see* Doc. 1-1 at 1 (copy of Petitioner's "Most Recent I-94" from the U.S. Customs and Border Protection which reflects an "Admit Until Date" of January 17, 2026, two years from his "Arrival/Issued Date" of January 17, 2024).)[6] Petitioner does not assert facts or submit any documentary evidence showing that his humanitarian parole term was extended past January 17, 2026. Nor does Petitioner assert facts or submit any documentary evidence that his parole was terminated (revoked) *prior to* January 17, 2026, the parole termination date. Petitioner acknowledges that his humanitarian parole (and work authorization) expired on January 17, 2026. (Doc. 1 at ¶ 19.)

It was not until *after* his humanitarian parole had expired automatically that Petitioner received a Termination of Parole letter following his April 1, 2026 arrest by the Missouri State Highway Patrol on suspicion of theft, after which he was placed under a federal immigration detainer and then held in federal immigration custody pursuant to 8 U.S.C. § 1225(b)(2)(A).[7] In short, the admitted facts establish that, in this case, the term of humanitarian parole Petitioner had been granted expired automatically, after which he was subject to "return or be returned" to the custody from which he had been paroled for immigration proceedings to continue. § 1182(d)(5)(A).[8]

---

[6] Petitioner correctly notes in his reply brief that Federal Respondents inaccurately assert in their show-cause response brief that Petitioner had been granted "conditional parole" under 8 U.S.C. § 1226. (*See* Doc. 5 at 10, n.5, 11.) In fact, the Termination of Parole letter attached to Federal Respondents' own brief states that Petitioner had been granted parole "and released . . . from custody pursuant to INA § 212(d)(5)," or 8 U.S.C. § 1182(d)(5)(A). Parole under § 1182(d)(5)(A) is functionally very different from conditional parole and allows an alien, *inter alia*, to receive certain federal benefits, to apply for adjustment of status, and to work. *See Rodriguez-Acurio v. Almodovar*, 811 F. Supp. 3d 274, 294-95 (E.D.N.Y. 2025).

[7] Petitioner similarly acknowledges that he is subject to detention under 8 U.S.C. § 1225(b)(2)(A).

[8] The Court notes that some district courts have read 8 C.F.R. § 212.5(e) to suggest that "renewal

Even assuming, *arguendo*, that the automatic-expiration provision under 8 C.F.R. § 212.5(e)(1) does not apply here, Petitioner argues that the revocation of humanitarian parole was unlawful because "there is no indication that Department of Homeland Security made any individualized assessment" in terminating his humanitarian parole. (Doc. 1 at ¶ 54.) The sole case Petitioner cites in support, *Doe v. U.S. Department of Homeland Security*, does not support this assertion as a matter of federal immigration law, however.

In *Doe*, the district court affirmed that under § 212.5(e)(2)(i), the Secretary may "proceed[] categorically in terminating parole" and that termination of humanitarian parole does not require "individual-specific reasons or consideration of individual-specific reliance interests." 2026 WL 880442, at *11 (applying *Doe v. Noem*, 152 F.4th 272 (1st Cir. 2025), which interpreted and applied 8 U.S.C. § 1182(d)(5)(A) in a similar manner). The district court held in *Doe* that all that is required is that the Secretary (or designated official) make "the requisite antecedent finding (here, that parole was no longer supported by humanitarian reasons or public benefit." *Id.* The district court explained that while it could determine whether the agency had "conclude[d] that parole's humanitarian or public-benefit purposes have been served before revoking [parole]," it could not review (substantively) the agency's decision that the purposes of parole had been served. *Id.* at *12 ("Thus, although the court may not review the antecedent decision, it may review the termination of parole to determine whether, as required by statute, it followed a decision by the Secretary that the purposes of parole had been served."); *accord Byron A. v. Bondi*, No. 26-1365 (PAM/JFD), 2026 WL 608535, at *2-3 (D. Minn. Mar. 4, 2026) (finding that the district court did not have jurisdiction to review the decision to terminate humanitarian parole); *Hirey v. Noem*, No. C25-4075-LTS-MAR, 2026 WL 91654, at *2-3 (N.D. Iowa Jan. 13, 2026) (same).

Accordingly, in *Doe*, the district court held that a generic "Termination Email"[9] sent to numerous parolees who had used CBP One and who had applied for admission to the United States

---

of parole is the automatic, default option, absent additional findings" by a designated official whether the alien's detention is in the public interest. *See, e.g.*, *Martinez Gamez v. Easterwood*, No. 4:26CV3009, 2026 WL 295400, at *4 (D. Neb. Feb. 4, 2026) (citing *Rodriguez-Acurio v. Almodovar*, 2025 WL 3314420, at *11, itself quoting 8 C.F.R. § .212.5(e)(2)). Petitioner does not make that argument here, and the Court does not address it.

[9] The Termination Email in *Doe* read as follows:

Notice of Termination of Parole

It is time for you to leave the United States.

was unlawful to the extent it purported to terminate the recipient's parole without any "indicat[ion] that the purpose of parole was accomplished or that an authorized official ever made any decision to that effect." 2026 WL 880442, at *2 & *11. Petitioner does not meaningfully argue here—nor could he—that the Termination of Parole letter issued in early April 2026 is deficient in the same way the Termination Email issued in *Doe* was legally deficient under federal immigration law. Neither does Petitioner argue (or provide any legal authority) that, as a matter of federal immigration law, the Court may review the discretionary determination that was made in Petitioner's case, that is, that "[n]either urgent humanitarian reasons nor significant public benefit warrant your continued parole at this time." (Doc. 5-1.)

Thus, even if his humanitarian parole had not simply expired automatically under its own terms on January 17, 2026 (as contemplated by federal immigration regulations governing humanitarian parole and the humanitarian parole document issued to Petitioner itself), and that the Termination of Parole letter had any legal effect, Petitioner does not show that the revocation of humanitarian parole was unlawful under federal immigration law.

## II. Does Petitioner's Detention Violate his Procedural Due Process Rights?

Next, Petitioner argues that the revocation of humanitarian parole and his subsequent detention, without an individualized determination of dangerousness or flight risk, violates his rights to procedural due process under the Fifth Amendment to the U.S. Constitution.[10] Petitioner argues that his detention without an individualized determination or findings (or, put another way,

---

> You are currently here because the Department of Homeland Security (DHS) paroled you into the United [States] for a limited parole period. Pursuant to 8 U.S.C. § 1182(d)(5)(A) and 8 C.F.R. § 212.5(e), DHS is now exercising its discretion to terminate your parole. Unless it expires sooner, your parole will terminate 7 days from the date of this notice.
>
> . . .
>
> Again, DHS is terminating your parole. Do not attempt to remain in the United States—the federal government will find you. Please depart the United States immediately.

2026 WL 880442, at *2 (alterations in original).

[10] As explained above, Petitioner's humanitarian parole either expired automatically following the two-year term for which it was granted or was properly revoked by notice. Petitioner does not provide persuasive legal authority that an "individualized assessment" is required to revoke humanitarian parole, nor can Petitioner seek judicial review of the revocation of humanitarian parole (if it was even effective in this case given the automatic expiration of the two-year term) through the mechanism of a procedural due process claim. Accordingly, the Court considers whether Petitioner's detention, following a prior grant of humanitarian parole which was terminated (whether automatically or on notice), is consistent with procedural due process required by the Fifth Amendment.

without bond), having previously been granted humanitarian parole, failed to satisfy "the minimum safeguards [due] and required by the Fifth Amendment." (Doc. 1 at ¶ 59.) Petitioner asserts that he has a protected liberty interest in freedom from detention or imprisonment having been granted humanitarian parole under 8 U.S.C. § 1182(d)(5), and that under the procedural due process balancing framework established in *Mathews v. Eldridge*, 424 U.S. 319 (1976), due process requires an opportunity for a hearing and an individualized determination that detention is necessary because he is dangerous or a flight risk.

The Fifth Amendment of the U.S. Constitution guarantees that "[n]o person shall be . . . deprived of life, liberty, or property without due process of law." In the background of each habeas case among many habeas cases adjudicated across the country involving aliens detained in the interior of the United States by federal immigration authorities while removal proceedings remain pending is this question: does the Fifth Amendment apply to aliens present in the United States without lawful status not having been admitted or otherwise authorized to be present in the United States? The answer, of course, is yes.

It has been well established that the Fifth Amendment—establishing the due process rights of, simply, "person[s]"—has a geographic hook, such that aliens (whether lawfully present in the United States or not) are entitled to the protection of due process. The Supreme Court has stated, broadly: "[a]liens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments." *Plyler v. Doe*, 457 U.S. 202, 210 (1982); *see Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (recognizing that "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent"); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976) ("Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection."); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) (noting that "[i]t is true that aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law"); *Wong Wing v. United States*, 163 U.S. 228, 238 (1896) ("all persons within the territory of the United States are entitled to the protection guaranteed by" the Fifth and Fourteenth Amendments); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886). The inverse to this proposition has been equally clearly stated, that is, that

"certain constitutional protections are available to persons inside the United States are unavailable to aliens outside of our geographic borders." *Zadvydas*, 533 U.S. at 693.

The next question, though, is what process is due? "Due process is flexible . . . and it calls for such procedural protections as the particular situation demands." *Jennings v. Rodriguez*, 583 U.S. 281, 314 (2018) (internal quotation marks omitted; quotation modified). In the immigration context, the Supreme Court has recognized in particular that what is required by due process "may vary depending upon status and circumstance." *Zadvydas*, 533 U.S. at 694.

For his part, Petitioner points to the interest-balancing framework under *Mathews*, in conjunction with the broad principle that the Fifth Amendment applies to all persons physically present within the United States and suggests that due process requires an individualized determination of dangerousness or flight risk (in effect, a bond hearing). The Government points to a different line of Supreme Court cases with a more limited view of the due process rights due to an alien who is present in the United States without having been admitted into the United States as a matter of federal immigration law.

In *Landon v. Plasencia*, 459 U.S. 21 (1982), the Supreme Court noted that it "has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative," but "once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly." *Id.* at 32 (also noting caselaw that "a continuously present permanent resident alien has a right to due process" when facing deportation). Earlier, in *Kaplan v. Tod*, 267 U.S. 228 (1925), the Supreme Court held that an alien minor who—pending deportation—had been committed to the custody of an immigrant aid society which had allowed her to live with her resident naturalized father "was still in theory of law at the boundary line and had gained no foothold in the United States" and was therefore lawfully detained under a warrant of deportation. *Id.* at 229. The Supreme Court's reasoning in *Kaplan*, articulated and reiterated by the Supreme Court in *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020), nearly one hundred years later, applies the so-called "entry fiction" theory, which underlies the Government's argument here.

In *Thuraissigiam*, the Supreme Court recognized the "entry fiction" theory as grounded in the context of "due process rights of an alien seeking initial entry." *Id.*at 139. Specifically, the Supreme Court in *Thuraissigiam* rejected an alien's argument that because he was detained by

federal immigration authorities immediately after crossing the border and while he was on U.S. soil (25 yards from the border), he had "the right to be treated more favorably" than someone immediately detained at the border who was seeking entry into the United States. *Id.* The Court reasoned that "an alien who is detained shortly after unlawful entry cannot be said to have 'effected an entry,'"[11] even if technically on U.S. soil, but is "treated for due process purposes as if stopped at the border" or "on the threshold" of entry—the entry fiction—and therefore is due "only those rights . . . that Congress has provided by statute." *Id.* at 140.

Ultimately, the Supreme Court in *Thuraissigiam* recognized both that (1) "aliens who have established connections in this country have due process rights in deportation proceedings," and at the same time, (2) "alien[s] at the threshold of initial entry [including as a function of the entry fiction theory] cannot claim any greater rights under the Due Process Clause" than what Congress has provided. *Id.* at 107. As to the second proposition, and as particularly relevant here, the Supreme Court in *Thuraissigiam* observed that the entry fiction applies to humanitarian parole, stating: "On the contrary, aliens who arrive at ports of entry—even those paroled elsewhere in the

[11] One of the difficulties apparent in understanding, applying, and considering existing caselaw in this immigration context is the limitation or nuance in written language and words. In the immigration context, "entry" can be "a distinct legal term of art." *Mullin v. Al Otro Lado*, 609 U.S. __, 146 S. Ct. 2079, 2108 (2026) (Sotomayor, J. dissenting). The Supreme Court has suggested, implicitly, that "entry" as a legal term of art refers to "admission" under federal immigration law. *See Jennings v. Rodriguez*, 583 U.S. 281, 297 (2018). In this quotation from *Thuraissigiam* itself, the term "entry" is used in both a more colloquial sense (referring to "unlawful entry," suggestive of physical presence) and the legal term-of-art sense (referring to an alien having "effected an entry). Federal immigration law defines "admission" as "lawful entry." 8 U.S.C. § 1101(a)(13)(A) (suggesting that "unlawful entry" is an alien's physical presence without having been admitted). As another example, take *Zadvydas*:

> The distinction between an alien who has *effected an entry* into the United States and one who has never *entered* runs throughout immigration law. It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders. But once an alien *enters* the country, the legal circumstances change, for the Due Process Clause applies to all "persons" within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.

533 U.S. at 693 (citations omitted). Context and structure suggests that in the *Zadvydas* quotation, the first references to "entry" are used as a legal term of art, while the third reference uses the term in the non-legal or more colloquial sense of referring to physical presence within the United States. This apparent distinction (and the imprecision of this language) is magnified when considering the entry fiction doctrine discussed above.

country for years pending removal—are treated for due process purposes as if stopped at the border."[12] *Id.* at 139 (internal quotation marks omitted); *see Kaplan*, 267 U.S. at 229.

The Eighth Circuit adopted and applied the entry fiction in the alien-detention context in *Borrero v. Aljets*, 325 F.3d 1003 (8th Cir. 2003). In *Borrero*, the Eighth Circuit considered whether a Cuban national who arrived at the border and was granted humanitarian parole under federal immigration law as a so-called "Mariel Cuban," *see* 8 C.F.R. § 212.12, could be detained after being found removable as an inadmissible alien and his prior parole revoked, even potentially indefinitely.[13] The Eighth Circuit employed the entry fiction, relying on *Mezei*, *supra*, reasoning that because "[p]arole does not constitute an entry" and the government unquestionably has "the power . . . to detain an alien who is stopped at the border," Borrero's detention (following review of parole under 8 C.F.R. § 212.12 after being found inadmissible and subject to removal) did not violate his due process rights.[14]

As applied here, the Government argues that Petitioner is only due the procedure provided by Congress (in effect, mandatory detention under 8 U.S.C. § 1225(b)(2)(A)), reasoning that humanitarian parole under 8 U.S.C. § 1182(d)(5)(A) is not admission and Petitioner is treated the same as any alien present in the United States without having been admitted (or without lawful

[12] Arguably, this passing statement, read in context, is most likely dicta (*Thuraissigiam* did not involve a grant of parole but rather the detention of an alien within the immediate vicinity—25 yards—of the U.S. border immediately after the alien had crossed the border). The Eighth Circuit has explained, however, that Supreme Court dicta should bear rightful consideration by the lower courts and should not be wholly disregarded merely as dicta. *See In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1064-65 (8th Cir. 2017) (en banc).

[13] Practically, Borrero, having been found removable as an inadmissible alien, could be subject "to indefinite detention because he [was] countryless," *Borrero*, 325 F.3d at 1008 (Heaney, J. dissenting), given that Cuba would not accept his return to the country, *id.* at 1005.

[14] After *Borrero*, the Supreme Court in *Clark v. Martinez*, 543 U.S. 371 (2005), held that *Zadvydas*—which had previously interpreted the post-removal-order detention statute, 8 U.S.C. § 1231(a) in the context of aliens who had been admitted but then ordered removed—applied to inadmissible aliens ordered removed as well. *Id.* at 386. As Justice Scalia made clear in *Clark*, however, *Zadvydas* and *Clark* were cases of statutory interpretation (with *Zadvydas* employing the canon of constitutional avoidance) rather than due process cases. *See id.* at 726. Thus, while *Clark* may have overruled *Borrero*'s holding vis-à-vis its statutory interpretation of the detention authorized under § 1231(a) as to inadmissible aliens ordered removed, it did not necessarily also overrule *Borrero*'s holding as to the separate due process claim, in which the Eighth Circuit employed the entry fiction in the context of immigration parole. In this vein, the Court notes that the Eighth Circuit recently cited (favorably) *Borrero* in the entry-fiction context in *Banyee v. Garland*, 115 F.4th 928, 932 (8th Cir. 2024), suggesting that the constitutional due process holding in *Borrero* remains good law even after *Clark*.

status or legal authorization to be present in the United States otherwise)—that is on the threshold of entry. There are good reasons why federal district courts around the country have questioned whether *Thuraissigiam* applies in the context of a habeas action by an alien in similar shoes as Petitioner here—having been detained some time (even years) after crossing the border (with legal authorization through humanitarian parole). Nevertheless, even assuming that *Thuraissigiam* (and the entry fiction) is not directly controlling, Petitioner's due process claim fails for a different reason.

As noted above, Petitioner points the Court to (and cites cases relying on) the *Mathews* interest-balancing framework. In *Montoya v. Chamberlain*, No. 4:26-cv-00259-RK, 2026 WL 1602930 (W.D. Mo. June 4, 2026), the Court recently considered the question whether mandatory detention without bond pursuant to 8 U.S.C. § 1225(b)(2)(A) violates an alien's procedural due process rights.[15] There, the Court looked to prior Supreme Court and Eighth Circuit caselaw—

---

[15] Again, Petitioner does not contest that he may be detained as a matter of federal immigration law under 8 U.S.C. § 1225(b)(2)(A). *See also Avila v. Bondi*, 170 F.4th 1128, 1136 (8th Cir. 2026) (holding, as a matter of statutory interpretation, that "§ 1225(b)(2)(A) mandates the detention of unadmitted aliens already present inside the United States"). As set out above, Petitioner's term of humanitarian parole expired automatically on January 17, 2026, or, at a minimum, was revoked in early April 2026. Either way, at the time of his detention, Petitioner did not have lawful status and was not admitted.

In addition, the Court notes that Petitioner appears to suggest that he obtained lawful status independent of the term of humanitarian parole by filing an application for adjustment of status during the term of humanitarian parole. He argues that "[d]ue process requires he be given a chance to be heard on his application" before his immigration case proceeds. (Doc. 1 at ¶ 37.) To the contrary, the Eighth Circuit has held that an alien has "no constitutionally protected liberty interest in the discretionary relief of adjustment of status," and thus an alien's due process rights are not violated when an aliens' immigration case proceeds despite a pending application for adjustment. *Hanggi v. Holder*, 563 F.3d 378, 384 (8th Cir. 2009).

Petitioner cites no legal authority that supports the proposition that the filing of an application for adjustment of status itself provides an alien "lawful status" to reside within the United States. Petitioner cites in support "USCIS Adjudicator's Field Manual, Chapter 40.9.2(b)(3)(A)." This chapter, however, concerns USCIS's application of 8 U.S.C. § 1182(a)(9)(B), a separate "inadmissibility" statute than what Petitioner has been charged with in his immigration case here. Section 1182(a)(9)(B) provides, with some statutory exceptions, that an alien is inadmissible if he has accrued a designated amount of time as being "unlawfully present in the United States" and who then seeks admission within an established time frame (three or ten years) of an earlier voluntary departure or removal. USCIS Adjudicator's Field Manual, Chapter 40.9.2 details "USCIS's policy concerning the accrual of unlawful presence and the resulting inadmissibility under [§ 1182(a)(9)(B) or (c)(i)(I)] of the [Immigration and Nationality] Act." Under that policy, "[t]he accrual of unlawful presence" for purposes of considering inadmissibility under § 1182(a)(9)(B) is tolled until a properly filed application for adjustment of status is denied by USCIS. *See also* 8 U.S.C. § 1182(b)(9)(B)(iv).

As various federal courts have recognized, "unlawful presence" and "unlawful status" are "not synonymous," but rather the two "'are distinct concepts'" under federal immigration law. *United States v.*

primarily, *Demore v. Kim*, 538 U.S. 510 (2003), and *Banyee v. Garland*, 115 F.4th 928 (8th Cir. 2024)—which previously considered in different respects the constitutionality of another mandatory detention provision under federal immigration law, 8 U.S.C. § 1226(c). The Court noted in *Montoya* that *Mathews* balancing did not play a role in either case (among other cases concerning due process claims raised by aliens in the admission or deportation context) and in fact, the Eighth Circuit in *Banyee* applied a bright-line rule that "detention during deportation proceedings is constitutionally valid." *Montoya*, 2026 WL 1602930, at *6 (quoting *Banyee*, 115 F.4th at 931 (itself quoting *Demore*)) (quotation modified).

*Montoya* resolves Petitioner's procedural due process claim here. Under *Banyee* and *Demore*, among the other cases discussed in *Montoya*, mandatory detention without bond hearing (or, put another way, detention under § 1225(b)(2)(A) without an individualized determination of dangerousness or flight risk) does not violate Petitioner's procedural due process rights. The Court incorporates its discussion of the issue in *Montoya* here. As the Eighth Circuit held in *Banyee*, "whatever balancing is necessary" to determine what process is due for aliens subject to detention under federal immigration law, the Supreme Court has already done so: "the government can detain an alien for as long as deportation proceedings are still pending" and no "individual determination" is required or necessary as a matter of procedural due process. 115 F.4th at 933. For "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Mathews*, 426 U.S. at 79-80.

---

*Venegas-Vasquez*, 376 F. Supp. 3d 1094, 1099 (D. Ore. 2019) (quoting *Chaudhry v. Holder*, 705 F.3d 289, 291 (7th Cir. 2013)). While *unlawful* presence and *unlawful* status may be distinct concepts, the distinction may collapse in some regard when considering *lawful* presence and *lawful* status. In the context of humanitarian parole, for example, lawful status goes together with lawful presence. An additional critical distinction, though, is that while parole provides an alien with lawful status (and perhaps lawful presence)—at least until it is terminated, whether automatically or on notice—parole is not admission. *See* § 1182(d)(5)(A); *see also Hernandez Alvarez v. Warden, Fed. Detention Ctr. Miami*, 175 F.4th 1258, 1268 (11th Cir. 2026) (recognizing that "a grant of *admission* carries a bundle of rights and privileges not available to those who bear other lawful statuses," and that "there are many forms of 'lawful status' that grant an alien the right to remain, yet do not necessarily amount to 'admission'"). "Lawful status and admission . . . are distinct concepts in immigration law," too, and "[e]stablishing one does not necessarily establish the other." *Sanchez v. Mayorkas*, 593 U.S. 409, 415 (2021). Indeed, the Court observes that "maintain[ing] continuously a *lawful status* since entry into the United States" is itself a statutory requirement to be eligible for adjustment of status. 8 U.S.C. § 1255(c)(2) (emphasis added). In short, the Court is not persuaded that, as a matter of federal immigration law, Petitioner "is considered lawfully present in the U.S. until USCIS adjudicates his application," given that (as Petitioner concedes) the term of humanitarian parole (and his work authorization) expired. And again, the Court reiterates that Petitioner does not challenge his detention on statutory grounds under 8 U.S.C. § 1225(b)(2)(A).

## Conclusion

For the reasons explained above, Petitioner's habeas petition, (Doc. 1), is **DENIED**.

**IT IS SO ORDERED**.

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED: September 1, 2026